J-S01004-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| MALIK S. YOUNGBLOOD, | : | |
| | : | |
| Appellant | : | No. 3329 EDA 2012 |

Appeal from the Judgment of Sentence September 4, 2012
in the Court of Common Pleas of Philadelphia County,
Criminal Division, No. MC-51-CR-0033090-2012

BEFORE: GANTMAN, P.J., MUNDY and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:  **FILED FEBRUARY 03, 2016**

Malik S. Youngblood ("Youngblood") appeals the judgment of sentence imposed following his conviction of indirect criminal contempt ("ICC") of a Protection From Abuse ("PFA") Order.[1]  We affirm.

On May 27, 2012, Ryshawn Gross ("Gross") filed a *pro se* PFA Petition pursuant to Pennsylvania's Protection from Abuse Act, 23 Pa.C.S.A. §§ 6101, *et seq*., seeking a PFA Order against her ex-boyfriend, Youngblood.[2]  On June 4, 2012, following a hearing, the trial court entered a final PFA Order with eviction (no contact) against Youngblood, with an expiration date of June 3, 2015.  On August 15, 2012, Youngblood was arrested and charged, at Docket No. MC-51-CR-0033090-2012, with one count each of ICC (in violation of the PFA Order) and terroristic threats, and at Docket No. MC-51-

---

[1] **See** 23 Pa.C.S.A. § 6114(a).

[2] Youngblood is the Father of Gross's child.

CR-0033091-2012, with one count of ICC (in violation of the PFA Order). After conducting a non-jury trial on September 4, 2012, the trial court found Youngblood guilty of one count of ICC at Docket No. MC-51-CR-0033090-2012, but not guilty of the charge of terroristic threats or the ICC count at Docket No. MC-51-CR-0033091-2012.

Youngblood's ICC conviction at Docket No. MC-51-CR-0033090-2012 relates to an incident which occurred on August 1, 2012, outside of the courthouse, after a contempt hearing regarding Youngblood's other alleged ICC violation had been continued. Gross testified that, as she was waiting outside the courthouse for her boyfriend to arrive, Youngblood exited the courthouse and threatened to kill her. N.T., 9/4/12, at 25-30.

The trial court sentenced Youngblood to six months of probation. Youngblood filed a post-sentence Motion, which he later withdrew. Youngblood filed a timely Notice of Appeal and a court-ordered Pa.R.A.P. 1925(b) Statement of Errors Complained of on Appeal.

On appeal, Youngblood raises the following issues for our review:

1. Did not the lower court err, abuse its discretion and violate [Youngblood's] federal and state rights to present a defense, due process, confrontation and fair trial, where the court precluded cross-examination of [Youngblood's] proffered evidence of a properly authenticated recorded phone message from [Gross,] which would have revealed [her] clear pecuniary motive to lie[,] and further undermined her credibility with the fact-finder[,] leading to a complete acquittal?

2. Was not the evidence insufficient as a matter of law to establish beyond a reasonable doubt that [Youngblood]

- 2 -

violated the [PFA O]rder in question where it was proven that [Gross] told numerous falsehoods, the court questioned [Gross's] credibility and was unable to determine more than that "something happened" and that [Youngblood] did not walk away when [Gross] approached him, rather than the elements of the charged crime?

Brief for Appellant at 4.

In his first issue, Youngblood contends that the trial court erred by precluding him from (1) questioning Gross about her financial motivation for bringing a false accusation against him; and (2) introducing Gross's voicemail message to Youngblood's new girlfriend, Eboni Ebo ("Ebo"), evidencing such motivation. *Id*. at 14. Youngblood asserts that, through the precluded cross-examination and voicemail message, he sought to demonstrate that he had previously designated Gross as the payee on his Supplemental Security Income ("SSI") disability checks, and that Gross had threatened to continue to have Youngblood arrested until he, once again, designated her as the payee. *Id*. at 14-15. Youngblood claims that he requested permission from the trial court to let him play the voicemail, but the trial court refused his requests. *Id*. at 16. Youngblood argues that, had the voicemail been played for the fact-finder, "a complete defense would

have been presented and a complete acquittal the likely result." ***Id***.[3] Youngblood contends that the trial court's errors, in precluding admission of the voicemail and cross-examination of Gross as to her financial motivation, were not harmless, and contributed to his conviction. ***Id***. at 17.

The admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. ***Commonwealth v. Reid***, 99 A.3d 470, 493 (Pa. 2014).

Additionally,

[t]he determination of the scope and limits of cross-examination [is] within the discretion of the trial court, and we cannot reverse those findings absent a clear abuse of discretion or an error of law. An abuse of discretion is not a mere error in judgment, but, rather, involves bias, ill will, partiality, prejudice, manifest unreasonableness, or misapplication of law.

***Commonwealth v. Davis***, 17 A.3d 390, 395 (Pa. Super. 2011) (citation and quotation marks omitted).

"Under the Sixth Amendment to the United States Constitution, an accused has the right to be confronted with the witnesses against him. The

---

[3] In the Argument section of his brief, Youngblood failed to include any citation to the record, including the places where he requested introduction of the voicemail and the places where the trial court refused such requests. ***See*** Pa.R.A.P. 2119(c) (providing that "[i]f reference is made to the … evidence, … or order, or any other matter appearing in the record, the argument must set forth, in immediate connection therewith, or in a footnote thereto, a reference to the place in the record where the matter referred to appears."). However, because Youngblood provided this information in his Statement of the Case, we will not find waiver of this issue.

main and essential purpose of confrontation is to *secure for the opponent the opportunity of* cross-*examination*." ***Commonwealth v. Paddy***, 15 A.3d 431, 447-48 (Pa. 2011) (emphasis in original).

> We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutional[ly] protected right of cross-examination. It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, and prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. As the United States Supreme Court has observed, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

***Commonwealth v. Bozyk***, 987 A.2d 753, 756-57 (Pa. Super. 2009) (quotation marks and internal citations omitted).

With regard to the cross-examination of Gross, the record reflects that the trial court permitted Youngblood's counsel to elicit testimony from Gross, on re-cross-examination, regarding her status as the payee of Youngblood's disability checks, as follows:

> [Defense Counsel]: And I forgot to ask one other question. Since she's back[,] I'm going to ask about [SSI], were you [Youngblood's] payee for his [SSI disability] checks?
>
> [Prosecutor]: Objection.
>
> The Court: Sustained.
>
> [Defense Counsel]: Your Honor, it actually goes to motive.

The Court: Well, I'll tell you what, she can answer yes or no. I don't want to hear anything else than that [*sic*]. If you want to establish some other things[,] then you do it with other witnesses. I might allow some more leeway.

[Defense Counsel]: Okay. At what point in time were you the beneficiary of these [SSI disability] checks?

[Gross]: From –

The Court: Just say yes or no, ma'am.

[Gross]: Yes.

The Court: Thank you.

[Defense Counsel]: And you no longer are, isn't that correct?

[Gross]: Yes.

[Defense Counsel]: No further questions, at this time.

N.T., 9/4/12, at 69-70.[4]

Regarding the voicemail message that Gross allegedly left for Ebo, the Commonwealth objected to its admission. **See** N.T., 9/4/12, at 75; **see also id**. at 78, 85. The trial court gave Youngblood's counsel an opportunity to lay a proper foundation for admission of the voicemail message by questioning Ebo. **See id**. at 74-75, 78. However, when asked if Gross had stated in the voicemail message that she wanted to be the payee of Youngblood's SSI disability checks, Ebo responded in the negative. **Id**. at

---

[4] Additionally, the prosecutor questioned Gross regarding her status as payee of Youngblood's SSI disability checks, and elicited testimony from Gross that she had not received any of Youngblood's SSI disability checks since September 2011. N.T., 9/4/12, at 73-74.

79. Ebo later changed her testimony regarding the content of the voicemail message, as follows:

> [Defense Counsel]: Ebo[], in that [voicemail] message was there any sort of mention by [] Gross about receiving the [SSI disability] check of [Gross]?
>
> [Ebo]: Yes, not [Gross] but [Youngblood].
>
> [Defense Counsel]: I'm sorry, [Youngblood], I said the wrong word, [Youngblood].
>
> [Ebo]: Yes.

*Id*. at 81.

The trial court was troubled by Ebo's inconsistent testimony, but provided Ebo with an opportunity to explain the inconsistency. *Id*. at 81-83. However, the trial court was not satisfied with Ebo's explanation as to why she initially had denied that Gross, in the voicemail message, said she wanted to be the payee of Youngblood's SSI disability checks. *See id*. at 82-85 (wherein the trial court noted that Ebo was unable to explain how she misunderstood the initial question regarding the content of the voicemail message, or why her answer to the second question regarding its content was the "truthful" answer). Accordingly, the trial court sustained the Commonwealth's objection to the admission of the voicemail message. *Id*. at 85.

Based on our review of the record, it is clear that Youngblood was, in fact, permitted to cross-examine Gross regarding her designation as the payee of his SSI disability checks, and that, at the time of trial, she was no

longer the payee. *See* N.T., 9/4/12, at 69-70. Thus, Youngblood's claim that he was precluded from cross-examining Gross on this issue is without merit. Although such cross-examination may not have been as extensive as Youngblood desired, we conclude that the limits imposed by the trial court were not unreasonable. *See Bozyk*, 987 A.2d at 756 (stating that trial judges retain wide latitude to impose reasonable limits on cross-examination based on concerns about harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant).

Similarly, we detect no abuse of discretion or error of law in the trial court's exclusion of the voicemail message from evidence. *See Davis*, 17 A.3d at 395. The trial court, as fact-finder, was free to disbelieve Ebo's testimony regarding the contents of the voicemail message, and to doubt her credibility. *See Commonwealth v. Johnson*, 668 A.2d 97, 101 (Pa. 1995) (stating that the finder of fact is free to believe all, part, or none of the evidence, and may determine the credibility of the witnesses); *see also* Trial Court Opinion, 3/31/15, at 7 (wherein the trial court stated its determination that Ebo did not corroborate Youngblood's theory). Accordingly, we find no merit to Youngblood's first issue.

Moreover, even if the trial court's evidentiary rulings constituted error, such error was not sufficiently significant to merit a new trial for Youngblood. "[A]n error cannot be held to be harmless unless the appellate court

determines that the error could not have contributed to the verdict."

***Commonwealth v. Newman***, 555 A.2d 151, 160 (Pa. Super. 1989)

(citations and quotation marks omitted). Here, despite the evidentiary

limitations imposed by the trial court, Youngblood's counsel was permitted to

discuss Gross's admission that she was previously the payee of Youngblood's

SSI disability checks, as well as the contents of the voicemail message, in

her closing argument, as follows:

> [Defense Counsel]: [] Let me make sure that I am not missing anything, I think that's – also, you didn't listen to the message[,] but you know because [] Ebo said that [] Gross threatened her August 12. You heard that there were threats on that message. And then[,] you also heard that there were [*sic*] something about the payee business, and you know that [Youngblood] receives [SSI disability], and you know that [] Gross used to be the payee, now she's not. And she's making noise about wanting to be the payee again, and I wish that you had listened to the whole message[,] but that's all that you know from here so.
>
> [The Court]: Okay.
>
> [Defense Counsel]: Your Honor. I suggest that all of it is made up. It's all made up, all of it. And it's all in revenge because [] Gross is not getting what [she] wants[,] what she thinks she should get from the criminal justice system[,] and you know what[,] she feels she should get some sort of [SSI disability] benefits too[,] I would submit.

***See*** N.T., 9/4/12, at 110-11. Thus, even if the trial court erred, we

conclude that such error was harmless, and did not contribute to the verdict.

In his second issue, Youngblood contends that the Commonwealth

failed to prove a violation of 23 Pa.C.S.A. § 6114 because the evidence did

not demonstrate that Youngblood acted with wrongful intent to violate the

PFA Order. Brief for Appellant at 18. Youngblood asserts that he had no intent to violate the PFA Order, and that Gross "*waited for him and followed him, not the other way around*." *Id*. at 18-19 (emphasis in original). Youngblood claims that the trial court found him in contempt not because it believed that Youngblood did anything violative, but rather because it "believed that 'something happened' and that therefore it *had* to find him guilty." *Id*. at 19 (emphasis in original). Youngblood argues that the trial court, as fact-finder, was unable to articulate a "specific act" committed by Youngblood which violated the PFA Order. *Id*. at 20. Youngblood contends that a mere finding that "something" happened is insufficient to support a conviction, and constitutes a violation of his due process rights. *Id*. at 20-21. Youngblood asserts that the trial court found that, whatever "confrontation" may have occurred between Youngblood and Gross, Youngblood was not the initiator, but simply failed to go in a different direction. *Id*. at 21. Youngblood claims that, because there was no proof that he wrongfully intended to disobey the PFA Order, his conviction must be overturned. *Id*.

In its Opinion, the trial court addressed Youngblood's second issue, set forth the relevant law, and determined that it lacks merit. *See* Trial Court Opinion, 3/31/15, at 3-4. We concur with the reasoning of the trial court and affirm on this basis as to Youngblood's second issue. *See id*.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/3/2016

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FAMILY COURT DIVISION – DOMESTIC RELATIONS BRANCH

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : : : | 3329 EDA 2012 |
| Appellee | : : | |
| v. | : : | |
| | : | MC-51-CR-0033090-2012 |
| MALIK YOUNGBLOOD | : : | |
| Appellant | : | |



MC-51-CR-0033090-2012 Comm. v. Youngblood, Malik S.
Opinion

7276296811

## OPINION

### PROCEDURAL HISTORY

On May 27, 2012, Ryshawn N. Gross (hereinafter, "Complainant") filed a *pro se* Protection From Abuse (hereinafter, "PFA") petition pursuant to the Pennsylvania Protection From Abuse Act, 23 Pa. C.S. §6101, *et seq.*, seeking a PFA Order against her ex-boyfriend, Malik Youngblood (hereinafter, "Appellant"). On May 29, 2012, Complainant was granted a Temporary PFA Order against Appellant which prohibited Appellant from contacting Appellee by any means. A hearing on the petition was scheduled for June 4, 2012. Complainant only appeared at the hearing on June 4, 2012 and presented an Affidavit of good service on Appellant. The Honorable Ida Chen entered a three (3) year Final PFA Order with eviction (no contact) against Appellant, with an expiration date of June 3, 2015. On August 10, 2012, a Criminal Complaint was filed charging Appellant with one count each of Contempt and Terroristic Threats in violation of the above-mentioned PFA Order. A trial date of September 4, 2012 was set.

1

After a trial on September 4, 2012 before the undersigned, the Court found Appellant "Not Guilty" on the charge of Terroristic Threats and "Guilty" on the charge of Contempt and sentenced Appellant to six (6) months probation. On September 18, 2012 Appellant filed a Motion for Reconsideration of Sentence, however on October 23, 2012, the Motion was withdrawn. The instant appeal of the Judgment of Sentence followed.

**ERRORS COMPLAINED OF ON APPEAL**

On April 1, 2013, Appellant, through his counsel, filed his 1925 (b) Statement. The "Statement of Errors Complained Of On Appeal" filed by Appellant consists of three issues concerning the instant matter. Appellant's issues are as follows:

1. The evidence was insufficient to find Appellant guilty of contempt beyond a reasonable doubt pursuant to 23 Pa. C.S.A. Section 6114(a), although the Court believed "something did happen" in the nature of a confrontation.

2. The Court erred as a matter of law and abused its discretion when it precluded appellant from presenting evidence of complainant's motive and bias to lie.

3. The Court erred as a matter of law and abused its discretion when it precluded appellant's evidence that a different court found complainant's allegation of appellant's violation of the PFA incredible because of its factual finding that the handwriting complainant claimed was appellant's was not in fact appellant's handwriting.

The Court will address Appellant's issues below.

2

## DISCUSSION

**THE EVIDENCE WAS SUFFICIENT TO FIND APPELLANT GUILTY OF CONTEMPT BEYOND A REASONABLE DOUBT PURSUANT TO 23 PA.C.S.A. 6114 (a).**

Where a PFA Order is involved, an indirect criminal contempt charge is designed to seek punishment for violation of the protective order. To establish indirect criminal contempt, the Commonwealth must prove: 1) the Order was sufficiently definite, clear, and specific to the contemnor as to leave no doubt of the conduct prohibited; 2) the contemnor had notice of the Order; 3) the act constituting the violation must have been volitional; and 4) the contemnor must have acted with wrongful intent. Commonwealth v. Jackson, 10 A.3d 341 (Pa. Super. 2010). If the above elements are established at trial, the court may hold the defendant in indirect criminal contempt and punish the defendant in accordance with the law. 23 Pa. C.S.A. Section 6114 (a).

The Final PFA Order against Appellant in this matter ordered, in pertinent parts, that: 1. "Defendant shall not abuse, harass, stalk, or threaten or attempt to use physical force that would reasonably be expected to cause bodily injury to the Plaintiff (Complainant here) or any other protected person **in any place where they might be found**."(emphasis added); 3. Defendant **is prohibited** from having **any contact** with plaintiff, either directly or indirectly, or any other person protected under this Order, **at any location**…" (emphasis added). *See* Final PFA Order of the Court By Default, June 4, 2012.

The criminal complaint in this matter states: "In violation of a validly issued Protection From Abuse Order, #1205V7975, the defendant approached the complainant, Ryshawn Gross, at or near 34 S. 11th Street and threatened to kill her."

At trial, the Complainant testified that on August 1, 2012, while the final PFA Order was in effect, Appellant and Complainant had attended a court hearing at 34 S. 11th Street, the

3

Philadelphia Family Court, Domestic Relations Branch courthouse. Complainant exited the courthouse first and waited for her boyfriend to meet her and accompany her to her home. Appellant then exited the courthouse and while in the immediate vicinity of the Complainant, verbally threatened her, thereby violating the PFA Order. Complainant stated:

> "....We had to go there for a contempt hearing, during that hearing the case was postponed. And they had let me leave.... I waited outside for my boyfriend to come pick me up. Malik left out the doors like, I'm gonna say about 6 to 7 minutes afterwards. He was on the phone, and he had mentioned like, 'there she go right there.' And he had threatened. He had said basically I'm a rat.... 'I should fuck you up. I should get somebody to kill you. Matter of fact, I'll kill you.' But he was on the phone at the time but he was pointing at me like, arguing with me." (N.T. 9/4/12 at 25-27).

When reviewing a contempt conviction, much reliance is given to the discretion of the trial judge, and thus the Superior Court is confined to a determination of whether the facts support the trial court's decision. Commonwealth v. Haigh, 874 A.2d 1174 (Pa. Super. 2005). Clearly, the evidence was sufficient for the court to find Appellant guilty of Contempt beyond a reasonable doubt as the four prong test was met under Commonwealth v. Jackson, *supra*. There was a valid PFA Order in effect containing provisions which were definite, clear and specific to Appellant which left no doubt as to the conduct which was prohibited. Appellant had notice of the PFA Order since he was personally served with said Order by a Philadelphia Police Officer on May 30, 2012. *See* Affidavit of Service attached to final PFA Order. The acts constituting the violation of the Order were obviously volitional and done with wrongful intent. Appellant was present and remained in the immediate vicinity of Complainant which was prohibited, he pointed at her and made verbal threats to harm and kill her, which she was able to hear. Upon exiting the courthouse and seeing Complainant, Appellant had a duty under the PFA Order to leave the vicinity of the Complainant, to go in a different direction away from her, and to have no contact with her whatsoever. He did not; rather, he did the complete opposite, which constituted contempt.

4

**THE COURT DID NOT ERR OR ABUSE ITS DISCRETION WHEN IT PRECLUDED APPELLANT FROM PRESENTING EVIDENCE OF COMPLAINANT'S MOTIVE AND BIAS TO LIE.**

Appellant's argument that he was precluded from presenting evidence of Complainant's motive and bias to lie is not supported by the record. Appellant's defense that Complainant had motive and bias to lie is grounded in two theories: 1) that Complainant was dissatisfied with the criminal justice system's unfavorable decision regarding her complaint of an alleged assault by Appellant on Complainant which occurred during her one of her visits to the prison; and 2) that because Complainant was at some point removed as the payee of Appellant's Social Security Supplemental Security Income payments (SSI), she retaliated by lying about the incidents which led to the instant Contempt arrest and conviction.

As to the first theory, Complainant was questioned on re-cross examination regarding her allegation that Appellant assaulted her during a prison visit with Appellant on March 21, 2012:

"Ms. Wayt:   Ms. Gross, you were visiting my client while he was in custody up until March 21 of this year, right?

…...

Complainant:  Correct

Ms. Wayt:   Okay. And on that day you made an allegation to the corrections officers that during a visit with my client he punched you in the back; isn't that right, didn't you make that allegation? ....

Complainant:  Yes.

Ms. Wayt:  And the prison did an internal investigation of that allegation, isn't that right?

Complainant:  Yes

…......

Ms. Wayt:  Were you informed of the results of their investigation?

Complainant:  Yes.

Ms. Wayt:   Weren't the results of their investigation that they found after viewing the video that he did not assault you?

5

Complainant: Something like that, yes.

Ms. Wayt: Isn't it true that you were then banned from any further visits?

Complainant: With him, yes." (N.T. 9/4/12 at 67-69)

Counsel for Appellant had sought to introduce the prison records of Complainant's incident report, however, since Complainant testified about the report and investigation and did not contradict the same, its admission was not necessary. No other evidence of this prison incident, testamentary or documentary, was proffered by Appellant to the court. Therefore, despite Appellant's claim, evidence of an alleged motive to lie by Complainant was permitted to be introduced through re-cross examination above, and Counsel for Appellant then used this testimony in her closing argument. (N.T. 9/4/12 at 111).

As to the second theory, not only was Complainant questioned about her status as payee of Appellant's SSI benefits, but a defense witness was also presented regarding this issue. On re-cross examination of Complainant, counsel for Appellant inquired:

"Ms. Wayt: And I forgot to ask one other question. Since she's back I'm going to ask about S.S.I., were you his payee for his S.S.I. checks?

....

Complainant: Yes.

....

Ms. Wayt: And you no longer are, isn't that correct?

Complainant: Yes." (N.T. 9/4/12 at 69-70)

Appellant's counsel was, therefore, able to elicit the foundation for her theory in closing argument that since Complainant no longer received monetary benefits from Appellant's SSI payments, this would be a motive or bias for her to lie about the instant charges, thereby casting doubt on her credibility. (N.T. 9/4/12 at 111).

6

In addition, Appellant called Eboni Ebo as a witness on this issue as well. Ms. Ebo was Appellant's girlfriend at the time of trial. Ms. Ebo, however, did not corroborate Appellant's theory. When questioned about a telephone voice message which was sent by Complainant to Ms. Ebo, the witness was asked:

"Ms. Wayt: Ms. Ebo, in that message does Ms. Gross say that she wants to be the payee again for Mr. Youngblood's S.S.I. check?

Ms. Ebo: No. " (N.T. 9/4/12 at 79).

Appellant was in no way precluded from presenting evidence on this issue and availed himself fully of that opportunity. Accordingly, even though the Court initially had reservations about the relevancy of whether Complainant was the payee of Appellant's S.S.I. benefits in relation to the charges herein, the Court did allow the examination of both Complainant and Appellant's witness, Ms. Ebo, on this issue, as the testimony shows.

**THE COURT DID NOT ERR WHEN IT PRECLUDED APPELLANT'S EVIDENCE THAT A DIFFERENT COURT FOUND COMPLAINANT'S ALLEGATION OF APPELLANT'S VIOLATION OF THE PFA INCREDIBLE BECAUSE OF ITS FACTUAL FINDING THAT THE HANDWRITING COMPLAINANT CLAIMED WAS APPELLANT'S WAS NOT IN FACT APPELLANT'S HANDWRITING.**

At trial, counsel for Appellant sought to introduce the opinions of another court in a separate matter regarding the parties to impeach the credibility of the Complainant in the instant matter. On cross-examination, Complainant was questioned about her testimony at Appellant's detainer hearing before Judge Kosinski regarding his arrest for the instant criminal charges. Specifically, part of that testimony involved threatening letters that Appellant allegedly wrote to Complainant while he was incarcerated. (N.T. 9/4/12 at 13-15, 34-35). Counsel for Appellant then read aloud to Complainant certain statements made by Judge Kosinski wherein he compared

7

Appellant's handwriting in a court record to the letters, and actually concluded that the handwriting in the letters was not appellant's handwriting. The Court sustained Appellee's objection to this line of questioning and would not allow further evidence to be presented on this issue. (N.T. 9/4/12 at 34-40).

The trial judge enjoys broad discretion regarding the admissibility of evidence. Daset Mining Corp. v. Industrial Fuels Corp., 326 Pa. Super 14, 473 A.2d 584, 588 (1984). The standard for appellate review of a trial court's decision regarding the admissibility or preclusion of trial evidence is extremely narrow, necessitating that such a ruling will not be reversed absent a manifest abuse of discretion. Eichman v. McKeon, 824 A.2d 305, 319 (Pa. Super. 2003). The Court was correct in precluding evidence of Judge Kosinski's opinions regarding Appellant's handwriting and its authenticity. Judge Kosinski's handwriting analysis was inadmissible as there was no proof or credentials presented that he was a handwriting expert. Therefore, his statements regarding Appellant's handwriting were merely his personal opinions and properly excluded. (N.T. 9/4/12, 38-40). Moreover, Appellant cannot now complain since the letters in question related to the charge of Terroristic Threats, of which Appellant was found "not guilty" by this Court.

## CONCLUSION

After hearing the evidence in this case, the Court found Complainant credible with regard to her testimony about the August 1, 2012 incident outside of Family Court wherein Appellant, upon seeing Complainant, did not leave the vicinity in violation of the valid final PFA Order prohibiting any contact with her, that he remained there, spoke to Complainant, pointed at her and threatened her with harm and death. Therefore, the Judgment of Sentence on the charge of Contempt should be affirmed

8

BY THE COURT:

_____
JOHNSON, J.

March 31, 2015

9